UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GREGORY LOGINS,

                         Plaintiff

-vs-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                         Defendant.
_____

DECISION AND ORDER

10-CV-6060 CJS

APPEARANCES

For the Plaintiff:          William J. McDonald, Jr., Esq.
                         Bond and McDonald
                         91 Genesee Street
                         Geneva, New York 14456

For the Defendant:        Kathryn L. Smith, A.U.S.A.
                         United States Attorney's Office
                         100 State Street
                         Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which terminated the disability benefits of Gregory Logins, Sr. ("Plaintiff").  Now before

the Court is Defendant's motion (Docket No. [#4]) for judgment on the pleadings and

Plaintiff's cross-motion [#6] for judgment on the pleadings.  Defendant's application is

denied, Plaintiff's cross-motion is granted, and this matter is remanded for further

administrative proceedings.

1

PROCEDURAL HISTORY

A brief summary of the general background facts of this case were accurately set

forth in Defendant's Memorandum of Law, as follows:

> Plaintiff's application for disability insurance benefits was granted by an
> ALJ on June 29, 1995, with an onset date of August 23, 1993. *See* Tr. 38.
> At that time, plaintiff met Listing 1.05C for back impairments. *Id*. In 1998
> and June 2002, the Commissioner conducted continuing disability reviews
> and benefits were continued for lack of medical improvement. *Id*.; *see
> also* Tr. 24-25.
>
> In or about early 2006, the Commissioner conducted a third continuing
> disability review. *See* Tr. 11, 20-23. Thereafter, the Commissioner
> determined that plaintiff was no longer disabled as of January 2006. *See*
> Tr. 11, 22-23. . . . At plaintiff's request, an administrative hearing was
> held on July 29, 2008 before ALJ William Straub, at which plaintiff
> appeared *pro se*[, waived his right to be represented,] and testified. Tr.
> 126-48. ALJ Straub considered the case *de novo* and on September 23,
> 2008, issued his decision finding that plaintiff's disability had ceased and
> that plaintiff was no longer entitled to disability insurance benefits. Tr.
> 8-19. The ALJ's decision became the final decision of the Commissioner
> when the Appeals Council denied plaintiff's request for review on
> December 4, 2009. Tr. 3-5. This action followed.

Def. Memo of Law [#4-2] at 1-2.

The present record, consisting of 148 pages, does not include the administrative

record from 1995, when Plaintiff was initially found to be disabled, nor does it include

any information from 1998, when Defendant conducted the first continuing disability

review.  However, as indicated above, Plaintiff was originally found to be disabled in

1995, with an onset date of August 23, 1993, because he was found to have a back

impairment that met or equaled Listing 1.05C. Tr. at 38.  Such listing, concerning

disorders of the spine, was later amended, effective February 19, 2002, and

renumbered as Listing 1.04. *See, Maynard v. Astrue*, 276 Fed.Appx. 726, 732, 2007

WL 495310 at *5 (10th Cir. Feb. 16, 2007) (citing 66 Fed.Reg. 58,010, 58, 010 (Nov. 19,

2001)).[1]

---

[1] 66 Fed.Reg. 58010-01 states, in pertinent part: "1.04 Disorders of the Spine
This final listing corresponds to current listing 1.05C, which we use for evaluating impairments like
herniated nucleus pulposus and lumbar spinal stenosis. We have expanded the list of examples in the
opening sentence to show that other conditions are also included, such as spinal arachnoiditis,
osteoarthritis, degenerative disc disease, facet arthritis and vertebral fractures, which are all examples of
conditions that may compromise nerve roots (including the cauda equina) or the spinal cord. As already
stated, we also describe several—though not all—of these conditions and their effects in final 1.00K (1.00I
in the NPRM). We have not described every possible impairment that can cause neurological involvement
because the effects of some of the impairments are identical to those we have described.

Consistent with the discussions in final 1.00K, we have named three separate sets of criteria under listing
1.04, for nerve root compression (final listing 1.04A), spinal arachnoiditis (final listing 1.04B), and lumbar
spinal stenosis resulting in pseudoclaudication (final listing 1.04C). Spinal arachnoiditis and lumbar spinal
stenosis with pseudoclaudication are listed separately because they present different signs and symptoms
than nerve root compression (which has many causes, including spinal stenosis) and neither condition is
adequately covered by the current rules.

Final listing 1.04A corresponds most closely to current listing 1.05C. We replaced the examples in the
current rule with the examples in final listing 1.04 and the discussions in final 1.00K. We also added a
criterion for positive straight-leg raising in the sitting and supine positions when there is involvement of the
lower back. We also removed the requirement for muscle spasm in current listing 1.05C because the
finding usually reflects an acute condition that will not persist for a year. Moreover, because spasm is
often an intermittent finding, it may not be present on a given examination even though an individual might
otherwise be significantly limited.

We also removed the requirement in current listing 1.05C that limitation of motion of the spine be
"significant." The requirement is imprecise. More importantly, we would consider any limitation of motion to
be significant if it were accompanied by the other requirements of the final listing. Under the final listing,
we no longer require anatomic or radicular distribution of both sensory and reflex abnormalities as
required under the current listing, but require only that one or the other be present. This is because
sensory and reflex abnormalities are not concurrent in all cases of nerve root compression that would
nonetheless be disabling at the listing level. Depending on the level of the compression, both sensory and
reflex abnormalities may not occur anatomically. However, the final listing does require a "neuro-anatomic
distribution" of pain to make clear that the nerve root compression would have to be reasonably expected
to cause the pain. This final requirement is consistent with our evaluation of pain and other symptoms
pursuant to §§ 404.1529 and 416.929 of our rules. We also clarified in final 1.00E1 what we mean by
"motor loss"—that is, atrophy with associated muscle weakness, or muscle weakness alone. Atrophy in
the absence of muscle weakness is not evidence of motor loss. We explain in final 1.00E, discussed
earlier, what we require to show atrophy.

Final listing 1.04A does not contain the criteria in current listing 1.05C for persistence of signs and
symptoms "for at least 3 months despite prescribed therapy" and that they be "expected to last 12
months." This is because we no longer require that there must invariably be a record of at least 3 months.
Instead we require that there be a longitudinal clinical record sufficient to assess the severity and expected
duration of an impairment, as explained in final 1.00H. In final 1.00H we explain that when there is no
longitudinal clinical record the evaluation will be based on all the available evidence.

With regard to the continuing disability review conducted in 2002, the record

contains several documents, which apparently comprise the entire record created at

that time. *See*, Tr. 24-25, 48-76.  In that regard, on March 18, 2002, Plaintiff indicated,

in a questionnaire, that he was not able to walk *at all*, and "mov[ed] about very little." Tr.

at 51.  Plaintiff further stated that his wife and/or mother performed household chores,

such as cooking, cleaning, and shopping. *Id*. at 52.  Plaintiff reported that he was able

to watch television, read, and attend church functions on Sunday, Monday, and

Wednesday. *Id*. at 52.  On May 20, 2002, Plaintiff completed another written

questionnaire, in which he reported that he felt pain in his back and legs, and could not

lift, squat, stand for long periods, or "climb a lot of stairs." *Id*. at 63, 66.  Plaintiff

indicated that he needed to use a back brace, prescribed by a Dr. Chang, and that he

could only walk for five-to-ten minutes before needing to rest. *Id*. at 64.  Plaintiff stated

that his back pain prevented him from interacting with his children and wife. *Id*. at 65.

Plaintiff also stated that his daily activities generally consisted of picking-up and

dropping-off his children at school, and staying at home, and preparing meals. *Id*. at 58-

60.  Plaintiff further stated that his wife performed all housework, yard work, and

shopping, and usually drove the family car, though he drove "sometimes." *Id*. at 61-62.

Plaintiff further indicated that his treatment consisted of taking ibuprofen and using a

---

Final listings 1.04B, for spinal arachnoiditis, and 1.04C, for lumbar spinal stenosis resulting in
pseudoclaudication, list the characteristic signs and symptoms of their respective impairments and require
appropriate limitations of function. Thus, final listing 1.04B describes severe burning or painful dysesthesia
resulting in the need for frequent changes in position or posture, and final listing 1.04C describes chronic
nonradicular pain and weakness resulting in an inability to ambulate effectively. In response to a public
comment, final listing 1.04B contains a more precise description of what we mean by frequent changes in
position or posture. The final rule states that the changes in position or posture must be more than once
every 2 hours.

heating pad. *Id*. at 67-68. On May 22, 2002, Plaintiff completed a further report in which he stated that he previously worked as a machinist, which involved walking, standing, sitting, kneeling, handling, writing, and lifting up to fifty pounds. *Id*. at 70.  On June 3, 2002, at the Commissioner's request  Plaintiff was examined by Michael Obrecht, D.O. ("Obrecht"), a consultative examining physician.  Plaintiff reportedly told Obrecht that his back pain was seven out of ten, and that he could not sit, walk, or stand for long periods. *Id*. at 108.  Plaintiff also indicated that he used a cane and a back brace. *Id*. at 109.  Plaintiff stated that he was unable to carry a gallon of milk or a small bag of groceries. *Id*. Obrecht noted that Plaintiff's then-current treatment consisted of taking ibuprofen and Tylenol. *Id*. at 108.  Upon examination, Obrech made the following findings about Plaintiff: 1) he appeared to have a "moderate backache"; 2) his gait was wide-based and flat-footed; 3) he was unable to walk on his heels; 4) he was only able to partially squat; 5) he rose slowly from his chair; 6) he had full flexion in his cervical spine, along with full extension, full lateral flexion bilaterally, and full rotary movement; 7) in his upper extremities he had full range of motion, normal reflexes, and full strength; 8) in his thoracic and lumbar spine, he had limited forward and lateral flexion, limited rotary movement, and mild tenderness in the area of L4-L5, but no spasm, and straight-leg testing was negative bilaterally; and 9) in his lower extremities, he had full range of motion in the hips, knees, and ankles, normal reflexes, no atrophy, and strength was 4/5 in the proximal hip musculature and 5/5 in the distal musculature. *Id*. at 110.  Obrecht's impression was "chronic lumbosacral back pain, probably musculoskeletal in origin," and his prognosis was "stable." *Id*. at 111.  Obrecht found no

evidence of radiculopathy.[2] *Id*. at 111 ("There were no findings consistent with radiculopathy.").  Obrecht concluded that Plaintiff would "have a mild exertional impairment for lifting and carrying greater than 50 pounds," but overall, "no specific deficits were noted during the exam." *Id*.[3]  Obrecht noted, though, that he did not have Plaintiff's medical records or prior diagnostic tests, which would have been helpful. *Id*.

Despite these mild findings, on June 24, 2002, the Commissioner issued a determination that Plaintiff remained disabled. *Id*. at 24-25.  With respect to this determination, the Commissioner noted that Plaintiff had originally been found disabled due to "degenerative disc disease and low back strain," and that there was "no significant medical improvement." *Id*. at 25.  On this point, the medical evidence apparently consisted only of Obrecht's report, which the Commissioner essentially paraphrased within his decision. *Id*.  Because the Commissioner found no medical improvement, he did not conduct a residual functional capacity assessment. *See*, 20 C.F.R. § 404.1594(c)(2) (Commissioner does not conduct a residual functional capacity assessment unless there has first been a finding of medical improvement).   The Commissioner's decision did not refer to a particular listed impairment under the Social Security Disability regulations.  However, in the present action, the Commissioner indicates that Plaintiff's impairments were considered in 2002 to have equaled a listed

---

[2] Radiculopathy is "any pathological condition of the nerve roots." MERRIAM WEBSTER'S MEDICAL DESK DICTIONARY at 599 (1993).

[3] Obrecht indicated in his report that x-rays were pending at the time he dictated the report, but it appears that prior to signing the report, he received a radiology report from Pesho Kotval, M.D., Ph.D., indicating that x-rays of Plaintiff's "lumbar sacral spine" showed "no bony or disc space pathology." *Id*. at 110-112.

impairment in 2002.[4] *See*, ALJ Decision, Tr. at 15 ("[T]he claimant's . . . impairments no longer met or medically equaled  the same listing that was equaled at the time of the CPD.").

In or about September 2005, the Commissioner commenced a second continuing disability review.  In connection with that review, on September 20, 2005, Plaintiff completed a questionnaire. Tr. at 77-82.  When asked to provide the name of any doctor that he had seen in the last twelve months, Plaintiff wrote, "your doctor," apparently referring to an agency physician or consultative physician. *Id*. at 78. However, there are no records or other indications that Plaintiff was seen by an agency physician, or any other doctor, during that period.  Plaintiff stated that he did not know the doctor's address. *Id*.  Plaintiff stated that he spent his days watching television, reading, and going to church. *Id*. at 81.  Plaintiff stated that he was able to drive, but occasionally had someone else drive him places, and that his children helped with cleaning and shopping. *Id*.  When asked to describe his "personal mobility," Plaintiff stated that he "walk[s] a little to get dress[ed] go to the bathroom and make sure my children get off to school." *Id*. at 80.

On December 30, 2005, Plaintiff was examined by Brij Sinha, M.D. ("Sinha"), a non-treating  consultative orthopedic doctor. *Id*. at 113-115.  Plaintiff told Sinha that his primary complaint was back pain, that was relieved with rest and medication, consisting of Advil and Tylenol. *Id*. at 113.  Plaintiff stated that his pain level was "four to ten," which the Court understands to mean that his pain ranged from four out of ten to ten

---

[4]The requirements for finding medical equivalence are set forth in 20 C.F.R. § 404.1526.

7

out of ten.  Specifically, Sinha's report states, "The intensity of the pain is 4 to 10." Tr. at

113.  Sinha did not indicate that Plaintiff's pain was only "four on a scale of one-to-ten."[5]

Such point is significant, because both the ALJ and Defendant's counsel in this action

have misquoted Sinha's report. *See*, ALJ's Decision, Tr. at 16 ("The claimant said the

intensity of his pain was level 4 out of 10 at that time."); Def. Memo of Law [#4-2] at 6

("Plaintiff rated the intensity of his pain as a four on a scale of one to ten.").

Plaintiff told Sinha that the pain did not radiate, but was "primarily localized in the

back." *Id*.  Plaintiff further told Sinha that he performed cooking, cleaning, laundry,

shopping, and child care. *Id*. at 113.  Upon examination, Sinha reported the following

findings regarding Plaintiff: 1) he appeared to be in no acute distress; 2) his gait was

normal; 3) he could walk on heels and toes without difficulty; 4) he could squat fully; 5)

he rose from his chair without difficulty and did not need assistance getting on or off the

exam table; 6) he had full hand grip strength; 7) he had full range of movement and

strength in his upper extremities; 8) in his thoracic and lumbar spine, he had full flexion,

extension, lateral flexion, and no spinal or paraspinal tenderness; 9) straight leg testing

was negative bilaterally; and 10) he had full range of movement and strength in his

lower extremities. *Id*. at 114.  Sinha reviewed an x-ray of Plaintiff's lumbo-sacral spine,

which showed only minimal scoliosis. *Id*. at 115.  More specifically, the radiology report

indicated that "the disc spaces, the pedicles and the S-I joints are normal.  There is

minimal scoliosis with convexity to the left." *Id*. at 115.  Sinha's diagnoses were

"hypertension," "back pain, by history," and "minimal scoliosis per x-ray; not clinically

---

[5]For example, elsewhere in his report, Sinha indicated that Plaintiff's strength was "five out of five" by writing, "5/5." Tr. at 114.

evident by exam." *Id*.  Sinha's prognosis was "fair." *Id*.  Additionally, Sinha stated:  "He has mild to moderate limitations secondary to back pain, by subjective.  There is [sic] no objective signs seen.  He needs immediate care of his blood pressure, and claimant had been advised to do so.  There are no other physical limitations seen at present." *Id*.

On February 2, 2006, Plaintiff completed another agency questionnaire. *Id*. at 85-91.  Plaintiff stated that he had not seen a doctor since his last disability report. *Id*. at 86.  Plaintiff also stated that his knees were sore and he did not want to get out of bed due to back pain, and that he was taking ibuprofen and Tylenol. *Id*. at 85, 88.  Moreover, Plaintiff reported that he could not sit for "a long period" due to back pain and leg pain. *Id*.  When asked to provide "remarks," Plaintiff wrote:

> There have been no change in my life.  I still have bad back pain no way I can go to work.  I don't play with my children because of my back problem.  I try to walk but I can I can [sic] walk for a long period of time nor sit for a long period of time.  The doctor you sent me to never touched my back.  He never look to see the back brace (for support of my back).  He ask could I bend and I could not.  He told me my blood pressure was high and my vision (eyes) were back [sic] too.  There were so many people there that I went in to see him for about 2-5 minutes.  That's not a[n] exam he never ask about my daily things or how I was feeling.  I have been disabled for about 11 years with this back problem.  This is my only income for me and my children.  No [one] will hire me with this back problem.  I wish that doctor would have asked more questions and examined me better.  I don't and can't have intercourse because of my back pain.

*Id*. at 91.

On May 8, 2006, Peter Seitzman, M.D. ("Seitzman"), a non-treating, non-examining consultative agency review physician, provided a residual functional capacity assessment. Tr. at 117-122.  Seitzman indicated that Plaintiff could occasionally lift up

to twenty pounds, frequently lift ten pounds, stand and/or walk for about six hours in an

eight-hour workday, and sit about six hours in an eight-hour workday. *Id*. at 118.  In that

regard, Seitzman observed, *inter alia*, apparently based on Sinha's report, that Plaintiff

had a full range of motion in "all joints & spines," normal "gait & station," and "full

manipulation" and grip strength in his hands. *Id*.

On July 13, 2006, Disability Hearing Officer Salvatore Agro ("Agro") issued a

decision, finding that Plaintiff was not disabled. *Id*. at 37-45.  Preliminarily, Agro noted

that Plaintiff had originally been found disabled because his impairment met the

requirements of listing 1.05C for back impairment. *Id*. at 38.  Agro further indicated that

for purposes of his analysis, the continuing disability review performed in 2002 was the

correct comparison point decision ("CPD").  *Id*.  On this point, Agro observed that the

only medical record from the 2002 review was Obrecht's report, while the only medical

records for the current review were Sinha's and Seitzman's reports. *Id*. at 38-39.  Agro

then compared Obrecht's report with Sinha's report, *id*. at 38-39.  Agro also indicated

that Plaintiff had appeared before the Commissioner on July 12, 2006, and provided

information, which Agro summarized, in pertinent part, as follows:

> Claimant has not ha[d] specific medical treatment for his back in years.
> He is seen periodically by his family doctor but in recent years it has been
> for routine colds, etc.  He has also been warned about being hypertensive
> but at this time is not on any medications for the condition.  . . .  Daily
> activities are described as betting the two youngest children off to school
> and then spending most of th day at home watching television and
> reading.  Socially, the claimant is limited to weekly church services and
> visits with his mother.  Regarding pain, claimant stated the average day is
> 6-7/10.  Bad weather worsens the pain as does excessive walking, sitting,
> and going up and down stairs.  The children assist with basic
> housecleaning and the claimant is able to prepare meals.  He drives short

distances and is able to do the family grocery shopping monthly.

*Id*. at 40.  Agro concluded that Plaintiff had experienced medical improvement, stating:

> At comparison point, the claimant had incurred a work-related back injury.
> Initial diagnostic [sic] was indicative of bulging annulus at L-5-S1.  Clinical
> evaluation noted wide-based and flat-footed gait.  Claimant could not walk
> on heels because of pain.  He completed only partial squat because of
> pain.  He rose from a chair slowly.  Currently, the claimant has a benign
> clinical examination.  Diagnostic evaluation reveals no evidence of disc
> pathology.  Therefore, medical improvement has been demonstrated.

*Id*. at 41-42.  Furthermore, Agro found that such improvement was related to Plaintiff's

ability to work. *Id*. at 42.  In addition, Agro found that Plaintiff did not have a severe

impairment. *Id*.  Agro consequently found that Plaintiff was not disabled. *Id*. at 45.

On August 1, 2006, Plaintiff appealed Agro's determination.  Plaintiff stated:

"The doctor was and is wrong he never took time I was in and out in 5 min. and I [am]

still disabled.  My back [is] still the same.  There is no change." *Id*. at 32.  From this, the

Court understands that Plaintiff was complaining that Sinha had not performed an

adequate examination.  That same day, Plaintiff completed yet another questionnaire.

*Id*. at 93-99.  The form questionnaire was largely blank, but stated that Plaintiff's back

pain was "worse," and that he was "laying down more." *Id*. at 93, 97.

On August 22, 2006, Plaintiff underwent MRI testing at Viahealth of Wayne-

Newark Campus. *Id*. at 123-124.  Specifically, the test was an "MRI of the lumbar spine

without contrast." *Id*.  The MRI report stated, in pertinent part:

> There is mild disc space narrowing  and dessication at L4-5 and L5-S1.
> There are mild bilateral facet degenerative changes at multiple levels.
> The overall diameter of the central canal is small due to congenitally short
> pedicles. . . .  L3-4:  There is mild diffuse disc bulge with a very small
> central disc protrusion abutting the ventral thecal sac.  There is no central

canal stenosis or neural foraminal stenosis.  L4-5:  There is a diffuse disc bulge with a small central disc protrusion.  There is no central canal stenosis.  There is minimal bilateral neural foraminal stenosis.

*Id*. at 124.  The report indicates that the MRI was performed at the request of Reuben Washington, M.D. and Gregory Heeb, M.D. ("Heeb").  *Id*. at 123.

On April 11, 2008, the Commissioner sent Plaintiff a letter, stating, *inter alia*, that Plaintiff should submit "updated records from all relevant sources prior to the hearing, including "treating sources." *Id*. at 100.  Additionally, the Commissioner included a form for Plaintiff to complete, by listing all medical treatment since July 27, 2006. *Id*. at 103.  Plaintiff received the correspondence. *Id*. at 128.  However, it does not appear that Plaintiff completed the form.[6]

On July 29, 2008, a hearing was held before Administrative Law Judge William E. Straub ("the ALJ"). Tr. at 128-148.  Testifying at the hearing were Plaintiff and Vocational Expert James Phillips ("the VE").  At the outset of the hearing, Plaintiff elected to proceed *pro se* and waived his right to representation. *Id*. at  128-129.  The ALJ indicated that he was receiving into evidence Exhibits B1E through B3F, as well as Plaintiff's "prior file," apparently referring to the aforementioned documentation from Plaintiff's earlier continuing disability reviews. Tr. at 1, 20-47A.  As already noted, the file from Plaintiff's original disability determination is not part of the record.  Plaintiff also brought his August 2006 MRI report to the hearing, and provided it to the ALJ. *Id*. at 133.

---

[6]The Commissioner also provided Plaintiff with a list of organizations providing representation to disability claimants. *Id*. at 102.  However, as discussed below, Plaintiff elected to proceed *pro se* at the hearing.

During the hearing, Plaintiff indicated that he was thirty-nine years old and had completed high school. *Id*. at 132. Plaintiff stated that he had constant back pain, which radiated down his right leg "sometimes." *Id*. at 136. Plaintiff stated that the pain severity was eight out of ten. *Id*. Plaintiff further stated that he needed assistance dressing himself, and that his children performed most of the household chores. *Id*. at 137-138. Plaintiff indicated that he very rarely cooked, and that he performed shopping with his children. *Id*. Plaintiff also indicated that he could walk about a block, could sit for only about fifteen minutes before needing to move around, and could not lift anything. *Id*. at 139-140. Moreover, Plaintiff stated that he had hypertension, and that his doctor wanted him to treat that condition by losing weight, instead of taking medication. *Id*. at 141.

When asked which doctors were currently treating him, Plaintiff replied that it was a doctor "under Dr. Herr [phonetic] in Newark," but Plaintiff could not recall his name. Tr. at 133. Plaintiff also stated that he was being seen by a "neurosurgeon," "Dr. Bunwire," for a wrist injury sustained in a fall. *Id*. at 134. Plaintiff indicated that he had not received any type of treatment for his back in several years, and that he just went to his doctor when he was in pain. *Id*. at 143. Plaintiff indicated that he had last been seen by a doctor for his back condition about sixty days prior to the hearing, but he could not remember the doctors's name. *Id*. at 134. [7] In that regard, Plaintiff testified:

---

[7] As noted earlier, Plaintiff had known about the hearing for many months, and had been asked to send the Commissioner information about his medical treatment, but did not do so. At best, Plaintiff indicated, at the hearing, that the doctor he was thinking of was someone who worked "under Dr. Herr," but the Court is not aware of such a doctor. It is possible that Plaintiff may have been referring to Dr. Heeb, who was identified on the August 2006 MRI report, but if so, Plaintiff never made that connection to the ALJ.

Q. And who, what doctors are currently treating you?

A. Dr., what is his name, he's under Dr. Herr [phonetic] in Newark, but its Dr., I can't even think of his name right now.

*Id*. at 133; *see also, id*. at 143 ('I'm trying to think of that doctor's name."). In any event, it does not appear that such doctor did anything particular for Plaintiff's back, since Plaintiff indicated that he had not received any treatment for his back in several years, and the only medications that he took were over-the-counter pain medications. Plaintiff stated that he had previously been prescribed a back brace by Dr. Reuben Washington. *Id*. at 136. Regarding the date that Washington prescribed the back brace, Plaintiff stated: "That was back in, I think that's, the paper says 06/22." *Id*. at 136. While such testimony is unclear, Plaintiff may have been referring to the date of the 2006 MRI, requested by Washington, which date was August 22, 2006.

After Plaintiff testified at the hearing, the ALJ took testimony from the VE. *Id*. at 143-147. The ALJ asked the VE to consider an individual with the Plaintiff's age, experience, and education, with "the functional capacity for light work with mild to moderate limitations secondary to back pain, blood pressure which is under control, and no other physical limitations." *Id*. at 145. The VE indicated that there were jobs which such a person could perform, such as fruit cutter and line packer, assuming that the person's back pain was mild. *Id*. at 146. The ALJ then asked the VE to consider a person with "a capacity for sedentary work; in other words able to sit for six hours, stand for two hours." *Id*. at 146. The VE stated that there were jobs that such a person could perform, including table worker and toy assembler. *Id*. at 146-147. Finally, the ALJ asked the VE to consider a person similar to Plaintiff, "limited to sitting less than two

14

hours a day, and lifting five pounds or less," and the VE responded that there were no

jobs that such a person could perform. *Id*. at 147.

On September 23, 2008, the ALJ issued his written decision, which found that

Plaintiff is not disabled. Tr. at  11-19.  In that regard, the ALJ followed the eight-step

sequential analysis set forth in 20 C.F.R. § 404.1594.  At steps one and two,

respectively, the ALJ found that Plaintiff had not engaged in substantial gainful activity,

and that he did not have a listed impairment.[8]  More specifically, the ALJ found that

Plaintiff's back condition did not meet listing 1.04, "disorders of the spine," because

Plaintiff did not have "nerve root or spinal cord compression, spinal cord arachnoiditis,

or lumbar spinal stenosis [narrowing which places pressure on the spinal cord] resulting

in an inability to ambulate effectively." *Id*. at 14.  At step three, the ALJ compared

Plaintiff's then-present condition with his condition in June 2002, at the time of the CPD,

and found that Plaintiff's condition had improved, for essentially the same reasons

given by Agro. *Id*. at 14.  Namely, the ALJ compared Obrecht's report and Sinha's

report, and found that Plaintiff had improved. *Id*. at 14-15.  At step four, the ALJ found

that Plaintiff's improvement was related to his ability to work, because Plaintiff no longer

met "the same listing [listed impairment] that he had met in 2002. *Id*. at 15.  In this

regard, the ALJ apparently assumed that Plaintiff had been found to have met listing

1.04 in 2002, even though, as already mentioned, the Commissioner's 2002

determination did not reference a listing.  At step six, the ALJ found that Plaintiff's

_____

[8]Although it does not affect the Court's decision, the Court advised counsel, during oral argument, that it was aware, based on information outside of the record, that Plaintiff is the Pastor of the House of Praise, a Church in Newark, New York.  The Court also indicated that it was aware that Plaintiff is a member of a gospel singing group, "Greg Logins and In Christ," which sells audio and video recordings through retail outlets such as Amazon.com.

impairments (back pain, obesity, and hypertension), were not severe because they did not cause "more than a minimal impact on [Plaintiff's] ability to perform basic work activities." *Id*. at 15.  In reaching this conclusion at step six, the ALJ found that Plaintiff's complaints of pain were not credible, purportedly based upon his application of the factors set forth in 20 C.F.R. §  404.1529, SSR 96-4p, and SSR 96-7p. *Id*. at 15.  With respect to this determination, the ALJ  found that although Plaintiff had a medically determinable impairment which could be expected to produce symptoms of back pain, Plaintiff's statements concerning those symptoms were not credible.  On this point, the ALJ stated, in pertinent part:

> In terms of the claimant's alleged back pain, Drs. Obrecht and Sinha noted negative straight leg raising and no findings consistent with radiculopathy.  X-rays and MRI showed only mild disc pathology since the CPD.  The claimant was not prescribed any narcotic medications and was taking only over-the-counter medication for pack pain (Motrin, Advil and Tylenol).  He testified he has not had any chiropractic or physical therapy in the last 2-3 years.  The [ALJ] notes there is no contemporaneous medical treatment or follow-up evidence in the record shedding any light whatsoever on the claimant's medical status during the period in question.

*Id*. at 17.  The ALJ further noted that Plaintiff was not receiving any treatment for hypertension, apart from his doctor's recommendation to lose weight.

Regarding the scarcity of Plaintiff's medical evidence and the possible need for development of the medical record, the ALJ stated:

> The regulations recognize that a disability applicant may not have the resources to personally obtain all pertinent medical evidence.  Therefore, the Administration will assist the applicant by writing to medical sources, named by the applicant, who examined and treated him or her and who can provide medical evidence relative to the period in question.  And, if those named sources are unable to provide evidence supporting the applicant's claim of disability, the applicant's responsibility under the

Regulations to provide proof of his or her disability has not been met.

In the claimant's case, the record contains only a two-year old MRI and no contemporaneous medical treatment records.[9] That [ALJ] notes that the claimant was asked to provide information with regard to his medications, recent medical treatment, and work background (Exhibit B-7E), but failed to do so. At the hearing, he said he last saw someone 45-60 days ago for his blood pressure[10], but the claimant did not know the names of his alleged treating sources. Despite all reasonable efforts by the Administration to obtain any available information pertaining to the claimant's medical status during the period at issue, the record in this case does not contain any medical reports or other evidence from acceptable medical sources establishing that the claimant had 12 continuous months of disability as a result of medically determinable and severe impairments or combination of impairments or evidence of on-going treatment consistent with any limiting or disabling condition. The undersigned finds that although the claimant had impairments during the relevant period of adjudication, they are not severe and his subjective complaints are not supported by objective medical diagnostic evidence and clinical signs and findings. Therefore, a finding of 'disabled' cannot be made under the evidentiary requirements of the Social Security Act and the Social Security Administration Regulations (20 CFR 404.1520(c)).

*Id*. at 18. Consequently, upon concluding that Plaintiff's current impairments were not severe, the ALJ concluded his analysis at step six of the eight-step analysis, and did not proceed to steps seven or eight. If the ALJ had found that Plaintiff's present impairments were severe, he would have considered, at step seven, whether Plaintiff was capable of performing his past relevant work. If the ALJ had found that Plaintiff was not so capable, he would have proceeded to step eight, and considered whether Plaintiff was capable of performing "other work."

---

[9]The ALJ was referring to Plaintiff's treatment records. The record also contained the reports by non-treating doctors Obrecht, Sinha, and Seitzman.

[10]As Defendant acknowledges, this statement is incorrect. Actually, Plaintiff testified that he had seen the unnamed doctor 45-60 days earlier because of back pain, not blood pressure. Tr. at 134-135; *see also*, Defendant's Memo of Law [#4-2] at 3, 17.

In this action, Plaintiff alleges that the ALJ erred in essentially seven ways, which are as follows: 1) the ALJ erroneously stated that Plaintiff had a burden of proof, when it is the Commissioner's burden to establish medical improvement; 2) the ALJ erroneously commented on the fact that Plaintiff did not seek treatment, since Plaintiff did not have a burden of proof; 3) the ALJ did not assist the *pro se* Plaintiff in developing the record; 4) the ALJ should not have followed the relevant Social Security Regulations, since they conflict with 42 U.S.C. § 423; 5) the ALJ's decision was not based on substantial evidence of improvement; 6) the ALJ failed to consider whether Plaintiff's back condition qualified as a listed impairment under Listing 1.05C, the listing in effect at the time of the original disability determination; and 7) the ALJ erroneously found, at step six of the eight-step analysis, that Plaintiff's impairments (back pain, hypertension, and obesity) were not severe.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

"After an individual has been found entitled to such benefits, his entitlement is to be periodically reviewed, *see* 42 U.S.C. § 421(i), and his benefits may be terminated if there is substantial evidence that the impairment has improved to such an extent that he is now able to work." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

In deciding whether a claimant continues to be disabled, the ALJ is required to develop the medical record:

> In making any determination with respect to whether an individual is under a disability or continues to be under a disability, the Commissioner of Social Security shall consider all evidence available in such individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability. In making any determination the Commissioner of Social Security shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis.

42 U.S.C.A. § 423(d)(5)(B) (2011).

> Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.  . . .  Social Security disability determinations are investigatory, or inquisitorial, rather than adversarial.  It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits. When a claimant properly waives his right to counsel and proceeds pro se, the ALJ's duties are heightened.

*Moran v. Astrue*,  569 F.3d 108, 112 -113 (2d Cir. 2009) (citations and internal

quotation marks omitted).  However, "[t]he SSA is not required to reconstruct the names

of doctors or medical centers which a particular claimant visited when the claimant is

now unable to recall that information.  Rather, the SSA must request records from only

those doctors and medical facilities that have been identified by claimants." *Negron v.*

*Barnhart*, No. 05 Civ. 5797(DLC), 2006 WL 1422753 at *3 (S.D.N.Y. May 23, 2006)

(*citing Dixon v. Shalala*, 54 F.3d 1019, 1036-1037 (2d Cir. 1995) (holding, in the context

of a class action involving the reconstruction of SSA claim files, that "reasonable efforts"

only requires the Commissioner to contact doctors identified by the claimant) (internal

quotation marks omitted).

## DISCUSSION

Plaintiff first contends that the ALJ erred by indicating that it was Plaintiff's

burden to establish that he is disabled.  However, the Court does not agree that the ALJ

improperly placed the burden of proof on Plaintiff.  As to this issue, the ALJ stated, in a

part of his decision which generally explained the procedure at step eight of the eight-

step sequential analysis, that, "[a]lthough the claimant generally *continues* to have the

burden of proving disability *at this step*, a limited burden of going forward shifts to the

Social Security Administration." Tr. at 12 (emphasis added).  The ALJ never reached

step eight of the analysis.  Moreover, contrary to Plaintiff's suggestion, the ALJ did not

place a burden on Plaintiff to prove that his condition had not improved.  Rather, it is

clear from the ALJ's decision that he understood and applied the fact that it was the

Commissioner's burden to establish, by substantial evidence, that Plaintiff's condition

had improved.  Furthermore, although the ALJ remarked on the fact that there was "no

contemporaneous  medical treatment or follow-up evidence in the record shedding any light whatsoever on the claimant's medical status during the period in question," such statement did not improperly shift the burden of proof onto Plaintiff. Tr. at 17.  The ALJ made that observation, as part of his analysis of Plaintiff's credibility, while noting the absence of evidence that Plaintiff had sought treatment for his back pain.

Next, Plaintiff contends that the ALJ failed to properly develop the record, by not obtaining the records from his original disability determination in 1995 and his first continuation of benefits proceeding in 1998.  The ALJ had the records from the "time of the most recent favorable medical decision" in 2002, and made them part of the record. However, Plaintiff maintains that the ALJ was also required to include the records from his original disability proceeding, and from his continuation proceeding in 1998.  As support, Plaintiff cites 20 C.F.R. § 404.1593(a), which indicates that, in continuing disability review cases, the Commissioner will have "the supporting medical evidence previously used to establish or continue your entitlement."  Under Plaintiff's theory, any time that an ALJ reviewed a claimant's continued eligibility for benefits, he would be required to include in the record the claimant's entire administrative record, going back to the original determination of disability.  The Court, though, disagrees with Defendant. In *Veino v. Barnhart*, cited earlier, a claimant was found to be disabled in 1973, and in 1982 the Commissioner determined that his condition had not improved. *Id*., 312 F.3d at 580.  In 1998, the Commissioner determined that the claimant's condition had improved and that he was no longer disabled. *Id*.  In making that determination, though, the Commissioner relied on a summary of the medical evidence which existed in 1982, but did not place the actual medical records in the administrative record. *Id*. at 587.

21

The Second Circuit reversed, finding that the ALJ was required to place in the record the actual medical records from 1982, so that a comparison could be made between the 1982 records and the 1998 records. *Id*. The Circuit Court found that such inclusion was required by 20 C.F.R. § § 404.1594(b)(1) & (7), since 1982 was the date of the "most recent favorable medical decision." *Id*. Significantly, the Circuit Court did not indicate that the Commissioner was also required to include the medical records from the original disability determination in 1973. Consequently, this Court finds that the ALJ was not required to develop the record by including Plaintiff's medical records from 1995 or 1998. Instead, he was entitled to rely on the records from the "most recent favorable medical decision" in 2002.

Plaintiff's next objection is that the ALJ erred by comparing his current condition to his condition in 2002, rather than to his condition in 1995. On this point, Plaintiff acknowledges that the pertinent regulations require the Commissioner to consider whether there has been improvement since the claimant's "most recent favorable medical decision." *See*, 20 C.F.R. § 404.1594(b)(1). However, Plaintiff contends that such regulations are invalid, since they conflict with 42 U.S.C. § 423(f). *See*, Pl. Memo of Law [#6-1] at 10 ("SSA's medical improvement regulations are invalid in so far as they permit SSA to terminate a claimant's benefits without showing any improvement in the conditions which justified the *original* grant of benefits.") (emphasis added). Plaintiff rests this argument on the possibility that a theoretical claimant might, at the time of a continuing disability review, have certain injuries or illnesses that were not present at the time he was initially found to be disabled. According to Plaintiff, when such

claimant later goes for another continuing disability review, he may be found to have improved, solely because the injuries or illness that were present at the most-recent favorable medical decision have improved, even though they were not related to the original disability.  Plaintiff has not cited any case authority to support this argument, and the Court declines to accept it.  Whatever the possible merits of such an argument, the scenario which Plaintiff proposes did not occur in this case, and therefore the issue is not ripe for determination.

Plaintiff further contends that the ALJ's determination that Plaintiff's condition had improved was not supported by substantial evidence.  For example, Plaintiff maintains that Sinha's report is insufficient to show improvement, because it purportedly does not identify particular signs or symptoms.  Plaintiff also argues that a comparison of Obrecht's report and Sinha's report does not show improvement, since Obrecht indicated that Plaintiff had only "mild" limitation on his ability to lift and carry, while Sinha stated that Plaintiff had "mild to moderate" limitations. Tr. at 111, 115.  The Court disagrees with Plaintiff on these points.  However, as noted above, the ALJ's findings and conclusions were erroneous in two respects:  First, the ALJ mistakenly understood that Plaintiff told Sinha that his pain was only four on a scale of one-to-ten, when Plaintiff actually said that his pain ranged from "4 to 10"; and second, the ALJ indicated that Plaintiff testified that he had seen a doctor "45-60 days ago for his blood pressure," when Plaintiff actually testified that he had seen that doctor because of back pain. Tr. at 18, 134-135.  On remand, the ALJ should reconsider the record in light of these corrections.

Plaintiff alleges that the ALJ also erred at step 4 of the eight-step analysis, by

23

finding that Plaintiff's medical improvement pertained to his ability to work because his impairments did not meet listing 1.04.  According to Plaintiff, the ALJ should have considered whether Plaintiff's impairments met listing 1.05C, which was in effect when Plaintiff was originally found to be disabled.  On this point, Plaintiff contends that listing 1.04 is more difficult to meet than listing 1.05C, though he does not explain why.[11]

Defendant agrees that the ALJ applied the later listing, and instead of arguing that such application was correct, states only that such application was "of little significance in this case." Def. Memo of Law [#4-2] at 15, n. 7.  The Court agrees that the ALJ should have considered Listing 1.05C at step four, instead of Listing 1.04.  In that regard, the Commissioner has indicated that newer Listing 1.04 should be applied to "new applications filed on or after the effective date of the rules and to other claims described in the preamble." 66 F.R. 58010-01, 58010, 2001 WL 1453802 (Nov. 19, 2001).  The Commissioner further stated, "[i]ndividuals who currently receive benefits will not lose eligibility as a result of these final rules." *Id*.  Additionally, the revised regulation states:

> When we conduct reviews to determine whether an individual's disability continues, we do not find that disability has ended based only on these changes in the listings. Our regulations explain that we continue to use our prior listings when we review the cases of people who receive disability benefits or SSI payments because we found that their impairments met or equaled those listings. In these cases, we determine whether the individual has experienced medical improvement, and if so, whether the medical improvement is related to the ability to work. If the individual's impairment still meets or equals the same listing section that we used to make our most recent favorable determination or decision, we will find the medical improvement is not related to the ability to work. If the

---

[11] Apart from Listing 1.04's requirement of a positive straight-leg raise test, it is unclear how 1.04 is more restrictive than 1.05C. *See, Curran-Kicksey v. Barnhart*, 315 F.3d 964, 967 (8th Cir. 2003) ("This new listing [1.04] *relaxes* some of the requirements of § 1.05C, making it *easier* for a person to show disability resulting from a spine disorder.") (emphasis added).

individual's condition has medically improved so that he or she no longer
meets or equals the prior listing, we engage in further evaluation to
determine whether the individual is currently disabled.
                                    ***

As is our usual practice when we make changes to our regulations, we will
apply these final rules to the claims of applicants for benefits that are
pending at any stage of our administrative review process, including those
claims that are pending administrative review after remand from a Federal
court. With respect to claims in which we have made a final decision, and
that are pending judicial review in Federal court, we expect that the court's
review of the Commissioner's final decision would be made in accordance
with the rules in effect at the time of the final decision.

*Id*. at 58011.  On remand, the ALJ should consider, at step four of the analysis, whether

Plaintiff meets Listing 1.05C.

Plaintiff also contends that that ALJ erred by finding that his impairments were

not "severe."  On this point, Plaintiff argues that the "severe" standard is intended to

weed out only *de minimis* claims, which his are not.  Additionally, he indicates that the

ALJ's finding of non-severity is inconsistent with Sinha's report, which found that

Plaintiff had "mild to moderate limitations secondary to back pain."  As for Sinha's

report, the Court does not agree that the ALJ's finding of non-severity was necessarily

inconsistent, since Sinha only indicated that Plaintiff had "mild to moderate limitations

secondary to back pain, *by subjective* [complaint]." Tr. at 115 (emphasis added).  Sinha

followed-up that statement by noting that he found no objective signs to support

Plaintiff's subjective complaints. *Id*.  Moreover, the ALJ explained why he found

Plaintiff's subjective complaints to be incredible. *Id*. at 15-17.  This leaves the question

of whether the ALJ otherwise erred in finding that Plaintiff's impairments (back pain,

obesity, and hypertension) were not severe.  Unfortunately, the Court cannot resolve

this issue on the current record, since the ALJ did not indicate the effect which Plaintiff's limitations had, if at all, on his ability to work.  In this regard, the ALJ never conducted a residual functional capacity assessment.  Rather, the ALJ found that Plaintiff's improvement was work-related, by finding that Plaintiff no longer had a listed impairment. Tr. at 15; see also, 20 C.F.R. § 404.1594(c)(3)(I).   Moreover, although the ALJ indicated that he gave "great weight" to the opinions of  Obrecht, Sinha, and Seitzman, those doctors gave differing opinions concerning Plaintiff's ability to lift, sit, stand, and walk. *See*, Tr. at 17.  For example, Obrecht stated that Plaintiff should not lift more than fifty pounds, while Seitzman indicated twenty pounds, and Sinha did not give a specific number. *Id*. at  111, 115, 118.  Similarly, Seitzman indicated that Plaintiff could sit, stand, and walk for six hours in an eight-hour workday, while Obrecht and Sinha did not indicate any particular limitations in that regard. *Id*.  Without some indication by the ALJ as to his specific findings concerning Plaintiff's limitations, if any, the Court cannot say whether his finding of non-severity is supported by substantial evidence.  For example, the Court has seen cases where ALJ's have found impairments to be "severe" where they are supported by findings as benign as those made by Seitzman.  Consequently, the case must be remanded for clarification as to the basis for the ALJ's finding of non-severity.

Plaintiff next contends that the ALJ failed to properly develop the record concerning Plaintiff's medical treatment.  As noted earlier, an ALJ has a duty to develop the record, particular in cases involving a *pro se* claimant.   In this case, the ALJ did not have a duty to request records from a doctor whom Plaintiff could not identify.  Nor did

the ALJ have a duty to obtain records from doctors concerning Plaintiff's wrist injury in 2008, since it does not appear that such treatment is relevant to this case.  However, the Court finds that the ALJ should have attempted to obtain records from Heeb and Washington, since it appears that both of them were providing treatment to Plaintiff for his back ailment during the relevant period.  In that regard, both doctors' names appear on the MRI report prepared in August 2006.  Accordingly, the Court will remand the action for further administrative proceedings, to allow the ALJ to develop the medical record.

Finally, Plaintiff complains that the ALJ should not have relied on Sinha's report, since Sinha's examination allegedly lasted only a few minutes and was inadequate. The Second Circuit has held that, where a *pro se* claimant complains that a consultative examining doctor's exam was cursory and his report contains inaccuracies, and the ALJ intends to rely on that report, the ALJ should treat the claimant's complaints as a request to have the ALJ subpoena the doctor to testify. *Fernandez v. Schweiker*, 650 F.2d 5, 8 (2d Cir. 1981).  Alternatively, the Second Circuit stated that, "[a]t the least [the ALJ] should have alerted claimant [of her] power to subpoena the doctor." *Id*.; *see also, Alvarez v. Bowen*, 704 F.Supp. 49, 53 (S.D.N.Y. 1989) ("This Circuit has previously recognized the importance of providing a claimant the opportunity to subpoena and cross-examine experts submitting reports adverse to his claim.") (citations omitted).  In this case, in response to Plaintiff's complaints about Sinha's examination, the ALJ did not inform Plaintiff that he had the right to subpoena Sinha to testify.  This was error, particularly since Sinha's report is the primary basis for the ALJ's decision.  On remand,

27

the ALJ should either call Sinha to testify, or advise Plaintiff of his right to subpoena

Sinha.  Additionally, because Plaintiff did not obtain his MRI test until August 2006,

neither Sinha nor Seitzman had the benefit of reading the report before preparing their

opinions.  On remand, the ALJ should obtain the opinion of a medical expert concerning

Plaintiff's ability to work in light of the MRI findings.

CONCLUSION

Defendant's application [#4] is denied and Plaintiff's cross-motion [#6] is granted,

to the extent that the Commissioner's decision is reversed and this matter is remanded

for a new hearing consistent with this Decision and Order, pursuant to 42 U.S.C. §

405(g), sentence four.

So Ordered.

Dated: Rochester, New York
        June 27, 2011

ENTER:

 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge